STATE OF NORTH CAROLINA v. STACEY ALLEN GLENN

No. COA11-897

(Filed 17 April 2012)

## 1. Evidence—unavailable witness—prior crimes or bad acts—testimonial statements—no opportunity for cross-examination—prejudicial

The trial court committed reversible error in a first-degree kidnapping, assault with a deadly weapon inflicting serious injury, and indecent exposure case by overruling defendant's objections to the admission of a statement from an unavailable witness concerning a prior act by defendant. The statement was testimonial and defendant had not had the opportunity to cross-examine the witness. Furthermore, the State failed to prove that the introduction of the statement was harmless beyond a reasonable doubt.

## 2. Evidence—prior crimes or bad acts—inadmissible under 404(b)

The trial court erred in a first-degree kidnapping, assault with a deadly weapon inflicting serious injury, and indecent exposure case by admitting evidence from two witnesses about prior sexual encounters with defendant where the evidence was inadmissible under Rule 404(b).

Appeal by defendant from judgments entered 13 December 2010 by Judge Phyllis M. Gorham in New Hanover County Superior Court. Heard in the Court of Appeals 10 January 2012.

*Attorney General Roy Cooper, by David L. Elliot, Director, Victims and Citizens Services and Brian C. Tarr, Assistant Attorney General, for the State.*

*Duncan B. McCormick, for defendant-appellant.*

CALABRIA, Judge.

Stacey Allen Glenn ("defendant") appeals from judgments entered upon jury verdicts finding him guilty of first-degree kidnapping, assault with a deadly weapon inflicting serious injury ("AWD-WISI") and indecent exposure. We grant a new trial.

## I. Background

On 21 May 2009, Kara Moore ("Moore") and a friend went to several bars in downtown Wilmington. Around 1:00 a.m. Moore's friend went home. Instead of leaving with her friend, Moore met two men at a bar, accompanied them to their apartment in downtown Wilmington and stayed with them for approximately one hour. While at the men's apartment, Moore smoked crack cocaine and consumed a beer.

Around 3:00 or 3:30 a.m., Moore left the men's apartment. While seeking a taxi cab to return to her home in Leland, a four-door vehicle pulled up and the driver asked her if she needed a ride. Moore mistakenly believed the vehicle was a cab, and sat in the front passenger seat. When Moore discovered the vehicle was not a cab and the male driver was not only naked from the waist down but also "had an erection," she immediately tried to exit the vehicle. When the driver realized Moore's intent to depart, he called her a bitch and grabbed her shirt. Moore resisted and managed to jump out of the moving vehicle. Since she was unable to safely exit as he drove away, she was "drug by [the] vehicle" and her shirt was torn from her body.

Law enforcement and Emergency Medical Services were contacted and Moore was transported to the hospital. As a result of exiting a moving vehicle, Moore sustained road rash, back and neck injuries and a permanent scar. While at the hospital, Moore viewed eight photographs and selected two men in an attempt to identify her potential attacker. Defendant's photograph was one of the two men Moore selected.

Defendant was subsequently arrested and charged with first-degree kidnapping, AWDWISI and indecent exposure. Beginning 6 December 2010, defendant was tried by a jury in New Hanover Superior Court. The jury returned guilty verdicts for all charges. For first-degree kidnapping, the trial court sentenced defendant to a minimum of 96 months and a maximum of 125 months and consolidated judgment for AWDWISI and indecent exposure to a minimum of 26 months and a maximum of 41 months. Defendant was to serve both sentences in the North Carolina Department of Correction. Defendant appeals.

## II. Constitutional Right to Confront Witnesses

[1] Defendant alleges the trial court violated his constitutional right to confront witnesses against him by overruling objections to testimony of a prior act by an unavailable witness. We agree.

**STATE v. GLENN**

[220 N.C. App. 23 (2012)]

### A. Standard of Review

When the Court reviews an alleged violation of a defendant's constitutional rights, the appropriate standard of review is *de novo*. *State v. Tate*, 187 N.C. App. 593, 599, 653 S.E.2d 892, 897 (2007). "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless...it was harmless beyond a reasonable doubt." *State v. Lewis*, 361 N.C. 541, 549, 648 S.E.2d 824, 830 (2007). When the State fails to prove the error was harmless beyond a reasonable doubt, "the violation is deemed prejudicial and a new trial is required." *State v. Rashidi*, 172 N.C. App. 628, 638, 617 S.E.2d 68, 75 (2005).

### B. Testimonial or Nontestimonial Statements

The Confrontation Clause of the Sixth Amendment prohibits admission of "testimonial" statements of a witness who did not appear at trial unless: (1) the party is unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 158 L. Ed. 2d 177, 203 (2004). Although *Crawford* did not define "testimonial," it did find that at a minimum, statements are testimonial if they were made as part of prior testimony in a hearing or former trial or those made during police interrogations. *Id.; see also State v. Clark*, 165 N.C. App. 279, 283, 598 S.E.2d 213, 217 (2004).

Whether statements made to law enforcement were "testimonial" was subsequently clarified by the United States Supreme Court in the companion cases of *Davis v. Washington* and *Hammon v. Indiana*. *Davis v. Washington*, 165 L. Ed. 2d 224, 234 (2006). In those cases, the Court found "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 237. In contrast, statements are "testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

The challenged testimony in *Davis* was held to be nontestimonial because "the circumstances of [the unavailable witness]'s interrogation objectively indicate[d] its primary purpose was to enable police assistance to meet an ongoing emergency." *Id.* at 240. In reaching this conclusion, the Court relied upon the following factors: (1) the unavailable witness spoke "about events as *they were actually hap-*

*pening*, rather than describing past events"; (2) the unavailable witness, facing an ongoing emergency, called "for help against a bona fide physical threat"; (3) the "elicited statements were necessary to be able to *resolve* the present emergency"; and (4) the informal interrogation where the unavailable witness's "frantic answers were provided over the phone, in an environment that was not tranquil, or even . . . safe." *Id.* (internal quotations omitted).

In *Michigan v. Bryant,* a recent United States Supreme Court case, the Court further examined how to determine the "primary purpose" of an interrogation and stated that "[t]o determine whether the 'primary purpose' of an interrogation is 'to enable police assistance to meet an ongoing emergency,' " courts should "objectively evaluate the circumstances in which the encounter occurr[ed] and the statements and actions of the parties." 179 L. Ed. 2d 93, 108 (2011) (internal citation omitted). The Court listed several factors for courts to consider when determining the primary purpose of an interrogation: (1) "the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred"; (2) objective determination of whether an ongoing emergency existed; (3) whether a threat remained to first responders and the public; (4) medical condition of declarant; (5) whether a nontestimonial encounter evolved into a testimonial one; and (6) the informality of the statement and circumstances surrounding the statement. *Id.* at 109-119.

### C.  Misty Hooper's Statement to Law Enforcement

In the instant case, the State introduced evidence regarding the 1999 interrogation of Misty Hooper ("Hooper"), who accused defendant of raping her at knifepoint in Aurora, Colorado however, defendant was only convicted of menacing. At the time of trial, Hooper was deceased and it was therefore undisputed that she was unavailable to testify and that defendant did not have an opportunity to cross-examine her.

The court conducted a pretrial hearing to determine whether Hooper's statements were admissible. Both Brian Baker ("Officer Baker"), a patrol officer with Aurora Police Department ("APD"), and Gregory McGahey ("McGahey"), a former detective with APD, were questioned to determine the primary purpose of Hooper's interrogation. Officer Baker testified that in September 1999 law enforcement in Aurora received a 911 call at 1:58 a.m. concerning a possible sexual assault. Officer Baker responded to the call at a Waffle House

STATE v. GLENN

[220 N.C. App. 23 (2012)]

restaurant. When he arrived, he encountered Hooper who was crying and visibly upset. Hooper told Officer Baker that she was waiting at a bus stop when a car approached and the driver asked her for directions. When Hooper leaned close to the car to give directions, the driver grabbed her shirt collar and instructed her to enter the vehicle. The victim claimed she entered the vehicle because he had a knife. He then drove to a parking lot where he raped and then released her. Hooper got dressed and walked to the Waffle House where law enforcement was called.

The trial court found that Hooper's statement to Officer Baker was given to enable police assistance to meet an ongoing emergency and therefore was admissible. Defendant again objected to the testimony when it was presented at trial, contending Hooper's statement was testimonial. The trial court overruled defendant's objection and allowed the officer to testify about Hooper's statement.

Defendant contends that the trial court's ruling was erroneous because there was no ongoing emergency at the time that Officer Baker interrogated Hooper. The State argues that the trial court's ruling was correct because Hooper's statement was analogous to statements which were held to be nontestimonial in *Bryant*. To support its argument, the State cites the evidence that Officer Baker arrived shortly after the 911 call, that he did not take notes during the interview, and that Officer Baker put out a "be on the lookout" ("BOLO") for the license plate numbers Hooper provided him.

In *Bryant*, law enforcement responded to a report that a man had been shot. *Bryant*, 179 L. Ed. 2d at 102. When they arrived, officers found the victim mortally wounded, lying next to his car. *Id.* The officers asked the victim "what had happened, who had shot him, and where the shooting had occurred." *Id.* (citation omitted). The victim told the officers he was shot through the defendant's back door and that after the shooting he got in his vehicle and drove to the convenience store parking lot. *Id.* The officers spoke to the victim for five to ten minutes, but the conversation ended when the paramedics arrived. *Id.* The victim died at the hospital. *Id.*

The Court in *Bryant* concluded that the victim's statements were not testimonial. *Id.* at 119. In so determining, the Court noted that it appeared there was an ongoing emergency since the location of the shooter was unknown, the motive for the shooting was unknown, and the officers also did not know if the shooter would arrive on the scene. *Id.* In addition, the victim was in considerable pain and asked

the officers when "emergency medical services would arrive." *Id.* at 118. Therefore, the primary purpose of his statement to the officers was seemingly to seek medical assistance, not "to establish or prove past events potentially relevant to later criminal prosecution." *Id.* The Court also thought the informality of the questioning was important, in that it occurred in an open, exposed area and the officers' questions were posed in a disorderly fashion. *Id.* at 112. Lastly, the officers' questions of who, what and where, were "the exact type of questions necessary to allow the police to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Id.* at 118. (citations and internal quotations omitted).

Prior to *Bryant*, the North Carolina Supreme Court determined statements made by a victim of a crime to law enforcement were testimonial. *Lewis*, 361 N.C. at 549, 648 S.E.2d at 830. In *State v. Lewis*, a woman was robbed in her home and law enforcement was called several hours later. *Id.* at 543, 648 S.E.2d at 826. In response to a series of questions, the victim gave the responding officer a statement which included the events that occurred and a description of the assailant. *Id.* The victim died prior to the defendant's trial and the State relied, in part, on the testimony of the investigating officers. *Id.* at 542-43, 648 S.E.2d at 826. The trial court allowed the victim's statement into evidence. *Id.* at 543, 648 S.E.2d at 826. On appeal, this Court found that the statements were testimonial and were not harmless beyond a reasonable doubt and granted defendant a new trial. *State v. Lewis*, 166 N.C. App. 596, 604, 603 S.E.2d 559, 564 (2004). The State appealed. The North Carolina Supreme Court found the first statement was nontestimonial. However, the second statement, the description of the defendant, was found to be testimonial but the admission was harmless beyond a reasonable doubt, thus reversing the judgment of the Court of Appeals. *State v. Lewis*, 360 N.C. 1, 22, 619 S.E.2d 830, 844 (2005). On petition for writ of certiorari, the United States Supreme Court vacated the judgment and remanded the case to the North Carolina Supreme Court for further consideration in light of *Davis v. Washington. Lewis v. North Carolina*, 165 L. Ed. 2d 985, 985-86 (2006). On remand, the North Carolina Supreme Court determined that the statements were testimonial and based its determination on the factors discussed in *Davis* including, (1) the victim faced "no immediate threat to her person"; (2) the officer was seeking to determine "what happened" rather than "what is happening"; (3) the interrogation bore the requisite degree of formality because the officer questioned the victim outside defendant's presence and as part of his investigation; (4) "the victim's statement deliberately recounted, in

response to police questioning, how potentially criminal past events began and progressed"; and (5) "the interrogation occurred some time after the events described were over." *Lewis*, 361 N.C. at 547, 648 S.E.2d at 829 (citation omitted). The Court also determined that while defendant's location was unknown at the time of the interrogation, *Davis* clearly indicated that this fact alone did not "in and of itself create an ongoing emergency." *Id.* at 549, 648 S.E.2d at 829 (citation omitted).

The instant case is more closely aligned with *Lewis* and distinguishable from *Bryant*. To determine the primary purpose of a statement responding to an interrogation by law enforcement, we first examine the circumstances surrounding the questioning. *Bryant*, 179 L. Ed. 2d at 115. In *Bryant*, the officers responded to a call that a man had been shot and found the victim "bleeding on the gas station parking lot, they did not know who [the victim] was, whether the shooting had occurred at the gas station or at a different location, who the assailant was, or whether the assailant posed a continuing threat . . . ." *Id.* at 115 (internal quotations and citations omitted).

In the instant case, Officer Baker responded to a 911 call of a sexual assault and approached Hooper in a parking lot, where there was no ongoing assault. In addition, Hooper had no signs of trauma and no suspect was present. Officer Baker testified that he understood that a sexual assault had occurred near a Waffle House in Aurora. Thus, Officer Baker knew an assault had already occurred, but when he first arrived at the restaurant, he was unaware of Hooper's safety, his safety, the safety of the general public or the location of the subject. However, there is no evidence that upon his arrival, he searched the area for the perpetrator or secured the scene.

Moreover, after Officer Baker began questioning Hooper, he knew the emergency situation was over. Once an officer determines there is no longer an ongoing emergency, statements by a witness can transition from nontestimonial to testimonial statements. *See Bryant*, 179 L. Ed. 2d at 111 ("A conversation which begins as an interrogation to determine the need for emergency assistance can evolve into testimonial statements." (internal quotations and citations omitted)). This may occur when statements made to officers initially appear to be an emergency are "no longer an emergency," or if the perpetrator "flees with little prospect of posing a threat to the public." *Id.* at 112.

When Officer Baker spoke to Hooper, he asked her if she wanted medical attention, but she refused. He also asked her what happened.

Thus, Officer Baker assessed the situation, determined there was no immediate threat and then gathered the information. Furthermore, Hooper told Officer Baker that defendant voluntarily released her from his car and then Hooper walked to the Waffle House. Officer Baker was aware that the situation that instigated the 911 call had ended. Therefore, even if Officer Baker believed there was an ongoing emergency when he arrived at the Waffle House, Hooper's statement transitioned from a nontestimonial statement into a testimonial statement after Officer Baker determined that no ongoing emergency existed.

Next, we examine whether there were any ongoing threats to the victim, to law enforcement or to the public. In *Bryant*, the victim was shot and then drove his car to the parking lot. *Id.* at 102. The Court recognized the fact that the victim drove away indicated that the victim "perceived an ongoing threat." *Id.* at 116. The Court reasoned that the defendant could potentially arrive at the gas station in pursuit of the victim. *Id.* at 119. In addition, the Court was concerned because the victim sustained a gunshot wound and they were unaware of the degree of "physical separation that was sufficient to end the emergency . . . ." *Id.* at 117 (noting that "[i]f an out-of-sight sniper pauses between shots, no one would say that the emergency ceases during the pause.").

In the instant case, defendant voluntarily released Hooper from his car and drove away. There was no indication that defendant would return to the area to harm Hooper again. Unlike the assailant in *Bryant*, who was armed with a gun, defendant in the instant case only displayed a knife to threaten Hooper. There was no evidence that Hooper sustained any injuries from the knife. Furthermore, even if defendant were to use the knife, he would have to be closer in physical proximity to harm her or others with a knife unlike that of a gun. Officer Baker was aware that defendant released Hooper from the car and drove away. There was no evidence that defendant was ever in the Waffle House parking lot or close enough to harm Officer Baker with his knife.

In determining whether there was a potential threat to the public at large, the *Bryant* Court looked at the defendant's motive for shooting the victim. *Id.* at 116-17. Since the officers in *Bryant* did not know the motive for the shooting, the Court recognized that the emergency was broad, encompassing a potential threat to the public, thus risking the safety of other individuals. *Id.* at 116. In Hooper's case, the evidence suggested defendant's motive was sexual and did not rise to the level of endangering the public at large. Hooper specifically told

Officer Baker that defendant stated he "just want[ed] sex." Officer Baker noted in his police report that defendant's only apparent motive was "sexual." This sexual motive, unlike the unknown motive of the shooter in *Bryant*, did not suggest an immediate threat to the public at large.

The *Bryant* Court also indicated the circumstances of the encounter provided context for understanding the victim's statements to officers. *Id.* at 119. In *Bryant*, several officers in an exposed area all asked the victim the same questions. *Id.* The Court noted that the victim "was obviously in considerable pain and had difficulty breathing and talking." *Id.* at 118. Therefore, the Court could not say the "primary purpose" of the victim's statement was "to establish or prove past events potentially relevant to later criminal prosecution." *Id.* (citation omitted). The *Bryant* Court noted " 'Statements for Purposes of Medical Diagnosis or Treatment' under Federal Rule of Evidence 803(4) as an example of statements that are 'by their nature, made for a purpose other than use in a prosecution.' " *Bullcoming v. New Mexico*, 180 L. Ed. 2d. 610, 629 (2011) (citing *Bryant*, 179 L. Ed. 2d at 109-10, n.9) (Sotomayer, J., concurring in part).

In the instant case, Officer Baker was the only officer questioning Hooper, therefore the circumstances of the questioning were more like an interview, and unlike the circumstances in *Bryant* where several officers asked questions. Officer Baker asked Hooper what happened and she narrated the events of the evening. Since Hooper had no obvious injuries, and initially refused medical attention, the primary purpose of her statement could not have been to obtain medical attention. Furthermore, Hooper seemed to have no difficulty in recalling the events, and gave Officer Baker a detailed description of the events, implying that her primary purpose was to provide information necessary for defendant's prosecution. In fact, Hooper told Officer Baker she wanted to prosecute the suspect. The *Bryant* Court also looked at the victim's responses to the officer's questions. *Bryant*, 179 L. Ed. 2d at 119. In *Bryant*, the victim's responses indicated there was an ongoing emergency. *Id.* Hooper's responses, however, showed that defendant voluntarily released her and drove away. There was no evidence presented that the primary purpose of her statement was for any other reason than to apprehend defendant. Consequently, the holding in *Bryant* is not dispositive in the instant case.

In examining the factors identified by our Supreme Court in *Lewis*, Hooper's statement to Officer Baker was clearly testimonial. Here, there was no impending danger, because the driver released Hooper and Hooper was waiting at a restaurant in a presumably safe environment. In addition, Officer Baker questioned her with the requisite degree of formality because the questioning was part of an investigation, outside the defendant's presence. Officer Baker wanted to determine "what happened" rather than "what is happening." *See Lewis*, 361 N.C. at 547, 648 S.E.2d at 829. Furthermore, Hooper's statement deliberately recounted how potentially criminal events from the past had progressed and the interrogation occurred after the described events ended. Finally, Hooper gave the officer a physical description of the driver, how he was dressed, his approximate age, and the type of vehicle he was driving. For a criminal case, this information would be "potentially relevant to later criminal prosecution." *Davis*, 165 L. Ed. 2d at 237.

### D. Prejudice

Since we find that Hooper's statement was testimonial, and thus that the trial court erred in admitting the statements, we must now determine whether the error was harmless beyond a reasonable doubt. *See Lewis*, 361 N.C. at 549, 648 S.E.2d at 830. When overwhelming evidence of guilt is presented against defendant, the constitutional error may be harmless beyond a reasonable doubt. *State v. Garnett*, ___ N.C. App. ___, ___, 706 S.E.2d 280, 285 (2011), *review denied*, 365 N.C. 200, 710 S.E.2d 31, 32 (2011) (citation omitted).

In the instant case, defendant was indicted for first-degree kidnapping of Moore and the State alleged that the purpose of the kidnapping was the commission of a felony, serious injury and terrorizing the victim. During closing arguments, the State used Hooper's statement to prove its theory, that defendant intended to rape and terrorize Moore. The prosecutor told the jury, "we know what he intends to do to women. Misty Hooper . . . is a textbook example of how he terrorizes women . . . and how he rapes them. And [Moore] was next." Later on, he again used Hooper's experience as a basis to convict defendant,

> Hooper . . . was a textbook example of what he does to women, and how he does it, and why. He finds women by themselves, late at night, when there's no one else around, he gets them into his car, and once he gets them there he uses terror and violence to rape them.

The jury ultimately determined that defendant kidnapped Moore for the purpose of terrorizing her.

The drivers in both the Hooper case and the instant case, picked up women in the early morning hours on public streets. Officer Baker testified that Hooper reported that defendant raped her after she got into his vehicle. In the instant case, when Moore entered the vehicle, the driver was not wearing pants and displayed an erection. The State implied that defendant was the driver of the vehicle and that he intended to terrorize and rape Moore just as he had done ten years earlier with Hooper.

However, in the other incidents the State introduced, none of the women were harmed. In fact, in each of those prior incidents defendant never kidnapped or attempted to kidnap the women. Hooper's statement was the only testimony introduced that indicated defendant would physically harm a woman. The State's introduction of evidence that defendant terrorized and raped another woman surely influenced the jury and was not harmless beyond a reasonable doubt.

Additionally, since the evidence presented to the jury was only a portion of the Hooper investigation it misrepresented the nature of Hooper and defendant's encounter. While Hooper initially claimed that defendant raped her, defendant only pled guilty to menacing. Furthermore, evidence was presented during the pretrial hearing that Hooper participated in prostitution. When McGahey questioned defendant, he claimed that he "was out looking for prostitutes" and that Hooper willingly had sex with him. Defendant claimed that he only picked up his knife when Hooper refused to get out of the car unless she received more money because "the sex took longer than anticipated." McGahey interviewed Hooper's sister and boyfriend. Hooper's sister stated that she was more of an "escort." However, Hooper's boyfriend validated defendant's story regarding Hooper's prostitution. Based on this information, McGahey testified that it was his "opinion that [Hooper] was engaged in prostitution." This information, coupled with defendant's ex-wife's testimony that defendant solicited prostitutes, makes it less likely that defendant raped Hooper. Since the State presented the jury only Hooper's initial statement to Officer Baker, that she was raped, without including the fruits of the investigation, the State provided a skewed view of the encounter. While we agree that this portion of McGahey's testimony should not have been entered into evidence, neither should Officer Baker's. The admission of Hooper's statement prejudiced defendant.

Furthermore, the State's evidence of defendant's guilt was not overwhelming. During trial, Moore positively identified defendant as her potential attacker, yet at the photo lineup she identified two men. Substantial evidence was presented that Moore had a long history of drug and alcohol abuse and that she had consumed seven alcoholic beverages and smoked crack cocaine on the night of the incident. In addition, Moore was only in the car approximately ten to thirty seconds before jumping out, therefore, this short period of time was not long enough to observe the driver. Evidence regarding the car was also ambiguous. Moore described the vehicle as a blue four-door vehicle. Even though security footage showed that the car had four doors, the color, model and license plate number were unclear on the DVD. Finally, neither Moore's missing shirt, nor any other evidence was found in defendant's car to prove that the car, she believed was a taxi on the night of her injuries, was defendant's vehicle.

The State has failed to prove that the introduction of Hooper's statement was harmless beyond a reasonable doubt and therefore, we grant defendant a new trial.

### III. Evidence of Prior Acts

**[2]** Since defendant raises an additional issue on appeal which may reoccur at a new trial, we choose to address the merits of the issue here. *See State v. Hyleman*, 324 N.C. 506, 511, 379 S.E.2d 830, 833 (1989). Defendant alleges the trial court erred in admitting evidence of prior acts committed when the evidence was not relevant, where any probative value was substantially outweighed by the danger of unfair prejudice and where the evidence was inadmissible under Rule 404(b). We agree.

Whether evidence was properly admitted under Rule 404(b) involves a three-step test. First, is the evidence relevant for some purpose other than to show that defendant has the propensity for the type of conduct for which he is being tried? *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Second, is that purpose relevant to an issue material to the pending case? *State v. Anderson*, 350 N.C. 152, 174, 513 S.E.2d 296, 310 (1999). Third, does the probative value of the evidence substantially outweigh the danger of unfair prejudice pursuant to Rule 403? *State v. Summers*, 177 N.C. App. 691, 697, 629 S.E.2d 902, 907, *appeal dismissed and disc. review denied*, 360 N.C. 653, 637 S.E.2d 192 (2006). This Court reviews questions of relevancy *de novo*, but accords deference to the trial court's ruling. *State v. Lane*, 365 N.C. 7, 27, 707 S.E.2d 210, 223 (2011) ("A trial court's rul-

**STATE v. GLENN**

[220 N.C. App. 23 (2012)]

ings on relevancy are technically not discretionary, though we accord them great deference on appeal."). The third step of the Rule 404(b) test—the Rule 403 balancing test—is reviewed for abuse of discretion. *Summers*, 177 N.C. App. at 697, 629 S.E.2d at 907.

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." N.C. Gen. Stat. § 8C–1, Rule 404(b) (2011). However, the court may admit the evidence "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C. Gen. Stat. § 8C–1, Rule 404(b) (2011). "Rule 404(b) evidence is admissible to prove identity when the defendant is not definitely identified as the perpetrator of the alleged crime." *State v. Gray*, ___ N.C. App. ___, ___, 709 S.E.2d 477, 488 (2011).

The rule of inclusion of evidence "is constrained by the requirements of similarity and temporal proximity. *State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 123 (2002). "Evidence of a prior bad act generally is admissible under Rule 404(b) if it constitutes 'substantial evidence tending to support a reasonable finding by the jury that the defendant committed the similar act.'" *Id.* at 155, 567 S.E.2d at 123. (citation omitted). However, "the similarities between the two situations" do not need to "rise to the level of the unique and bizarre. Rather, the similarities simply must tend to support a reasonable inference that the same person committed both the earlier and later acts." *State v. Stager*, 329 N.C. 278, 304, 406 S.E.2d 876, 891 (1991) (citation omitted). "[T]he more striking the similarities between the facts of the crime charged and the facts of the prior bad act, the longer evidence of the prior bad act remains relevant and potentially admissible for certain purposes." *Gray*, ___ N.C. App. at ___ S.E.2d at 488.

In the instant case, the trial court allowed the State to introduce evidence from two witnesses about sexual encounters with defendant. Each instance had some similarity to defendant's alleged assault on Moore. One of these was Officer Baker's testimony concerning Hooper. Since we determined that evidence should have been excluded under *Crawford*, it will not be repeated here.

The trial court also allowed the testimony of Chelsie Clark ("Clark"), a woman assaulted in Longmont, Colorado in 2000. The trial court allowed Clark's testimony to show identity, *modus operandi*, intent, plan, scheme, system, or design. Clark testified that

a man approached her while she was enjoying her early morning walk, pulled down his pants and grabbed at her as she ran away to a neighbor's house. Clark was able to identify defendant in both a photo lineup and in court.

For admission under 404(b), the State must show that the incidents were sufficiently similar. *See Al-Bayyinah*, 356 N.C. at 155, 567 S.E.2d at 123. In both the instant case and the Clark case, an assailant exposed himself to the women and grabbed them but the circumstances were very different. In the Clark case, defendant was on foot, he was partially clothed and then removed his penis to expose it. Subsequently, he grabbed at Clark in a sexual manner by grabbing at her breasts and buttocks. While he followed her up the driveway towards her neighbor's house, he did not attempt to restrain her.[1] Clark testified that he "grabbed at" her. She stated that she hit him and pushed him away.

In contrast, Moore's assailant was in a vehicle when he approached her. Moore voluntarily got into the vehicle and discovered that the assailant was not wearing pants. The man called her a bitch and grabbed her hair and shirt as she attempted to exit the vehicle. In the instant case, there was no evidence the assailant attempted to touch Moore in a sexual manner. Furthermore, the incident with Clark occurred nine years prior to the incident with Moore. Given the differences in the two instances, as well as the remoteness in time of the incident with Moore, we find the admission of the evidence was error. *See Gray*, ___ N.C. App. at ___, 709 S.E.2d at 488. The only purpose for the introduction of the evidence was to show that defendant "has the propensity for the type of conduct for which he [was] tried." *See Coffey*, 326 N.C. at 278, 389 S.E.2d at 54.

Since we have determined that the evidence should not have been admitted under Rule 404(b), there is no reason to analyze whether the issue was relevant, or whether the probative value of the evidence outweighed the prejudicial effect. Furthermore, since we granted a new trial on the issue of testimonial evidence, there is no reason to determine whether this evidence was prejudicial.

### IV. Closing Arguments

Defendant alleges the trial court erred in failing to intervene *ex mero motu* when the prosecutor suggested during closing arguments

---

1. We note that the trial court did make findings when admitting evidence under Rule 404(b) and found that Clark was restrained. However, based on the testimony, we find that the evidence did not support the judge's finding.

that if defendant was found not guilty he would prey on the jurors' female family members. However, since we have determined a new trial is warranted on other grounds, and it is unlikely this error will reoccur, it is unnecessary to decide whether the trial court erred by not intervening *ex mero motu. See State v. Saunders,* 35 N.C. App. 359, 363, 241 S.E.2d 351, 353 (1978).

## V.  Conclusion

The trial court violated defendant's constitutional right to confront witnesses against him by allowing Officer Baker's testimony concerning Hooper's statement, because her statement was testimonial. In addition, we find that admission of Clark's testimony was error as the incident was not sufficiently similar to the instant case.

New trial.

Chief Judge MARTIN and Judge McGEE concur.